United States District Court
Eastern District of Michigan
Southern Division

United States of America,

Case No. 2:23-cr-20573

v.

Hon. Nancy G. Edmunds

Illya Angelov,

Defendant.

_____/

## Government's Sentencing Memorandum

Between 2017 and 2021, Illya Angelov—using online monikers that included milan and okart—managed a cybercriminal group based in Russia and designated by the FBI as Mario Kart. Private security researchers have used other designations for this group, including TA-551, Shathak, GOLD CABIN, Monster Libra, ATK236, and G0127.

The group was a well-organized business. Angelov and coconspirators built a network of compromised computers (a "botnet") through distribution of malware-infected files attached to spam emails. Angelov and his co-manager then monetized this botnet by selling access to individual compromised computers ("bots"). This access was sold to other criminal groups, who typically engaged in ransomware extortion schemes: locking victims out of their computer networks and demanding extortion payments to restore access.

While it is impossible to calculate the entirety of the losses that resulted from Angelov's scheme, the FBI has identified seventy-two U.S. corporations that made over fourteen million dollars in extortion payments to a single ransomware organization with which Angelov's group conspired. A second ransomware organization paid Angelov's group over one million dollars for access to its bots, but the exact damage done during the time of this second conspiracy is unknown.

On October 19, 2023, Angelov pleaded guilty to one count of Conspiracy to Commit Wire Fraud (18 U.S.C. §1349).

Angelov's guidelines range as calculated by the probation department and the government is 121 to 151 months of imprisonment. The government, however, requests that the Court adopt a reduced guidelines range of 61 to 76 months when sentencing this defendant and believes that a sentence of 61 months incarceration followed by three years' supervised release is "sufficient, but not greater than necessary," pursuant to the purposes of 18 U.S.C. § 3553(a).

I.      **Background**

The National Institute for Standards and Technology (NIST) defines Malware as a "[s]oftware or firmware intended to perform an unauthorized process that will have adverse impact on the confidentiality, integrity, or availability of an information system." https://csrc.nist.gov/glossary/term/malware. Malware can be distributed by spam, which is defined by NIST as "[e]lectronic junk mail or the abuse

2

of electronic messaging systems to indiscriminately send unsolicited bulk messages." https://csrc.nist.gov/glossary/term/spam.

According to the Cybersecurity & Infrastructure Security Agency (CISA), botnets are "networks of computers infected by malware and controlled remotely by cybercriminals, usually for financial gain or to launch attacks on websites or networks." https://www.cisa.gov/sites/default/files/publications/Malware_1.pdf.

CISA defines ransomware as "an ever-evolving form of malware designed to encrypt files on a device, rendering any files and the systems that rely on them unusable. Malicious actors then demand ransom in exchange for decryption. Ransomware actors often target and threaten to sell or leak exfiltrated data or authentication information if the ransom is not paid." https://www.cisa.gov/stopransomware/ransomware-faqs.

Ransomware extortion payments to cybercriminals peaked in 2023 at $1.25 billion, according to the 2025 Crypto Crime Report, by Chainalysis. https://www.chainalysis.com/blog/2025-crypto-crime-report-introduction. In 2024, ransomware attackers received $813.55 million from victims. *Id.*

## II. Offense Conduct

### A. Angelov's Scheme

Angelov was the co-manager of the Russian cybercriminal group designated by the FBI as Mario Kart and alternatively known as TA-551, Shathak, GOLD

CABIN, Monster Libra, ATK236, and G0127. The group operated between approximately 2017 and 2021, and it included software coders that filled various roles—such as developing programs that distributed spam email, developing malware, and refining malware to evade virus-detection software. Angelov and his co-manager created the group, recruited members, and oversaw its various activities.

Cybercriminal groups operate as businesses. They have business models, managers, and employees. Some specialize and provide niche services as part of a criminal ecosystem. For example, one group may distribute malware to build a botnet of infected computers and then sell individual infected computers to a second group that distributes ransomware and engages in extortion. Other groups have evolved to launder the subsequently extorted gains. The Mario Kart group was a critical link in a chain that resulted in U.S. victims paying millions of dollars in extortion payments after being infected with ransomware.

Through a massive spam email campaign—which could send 700,000 emails a day—the group distributed malware around the globe. If an unwitting recipient clicked on an attachment to one of the group's emails, concealed malware would infect their computer and add it to the Mario Kart botnet. At the height of the group's operation, approximately 3,000 computers per day could be infected.

The Mario Kart malware provided a backdoor through which software could be uploaded to victims' computers. Instead of directly exploiting this access, the

4

Mario Kart group sold it to customers—other cybercriminal groups. These customers typically used the backdoor access to distribute ransomware, encrypting victims' data and demanding extortion payments to decrypt it.

Selling this access was Mario Kart's profit engine, and Angelov and his co-manager were the negotiators of these deals.

## B. Loss Estimate

The Sentencing Guidelines require that "in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy)," that a defendant must be held responsible for "all acts and omissions of others that were . . . (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction." USSG § 1B1.3(a)(1)(B). "Accordingly, the amount of loss attributable to a defendant may include any loss that resulted from his/her own criminal conduct, as well as any loss that resulted from certain conduct of others." *United States v. Donadeo*, 910 F.3d 886, 894 (6th Cir. 2018).

A full accounting of loss connected to Angelov and the Mario Kart group is impossible, but the FBI has been able to put a floor on the losses: $14,170,909.28.

This number is calculated by examining extortion payments made to one

ransomware organization with which Anglov's group conspired. Extortion payments were only tallied if they were made during a period in which the two groups were actively conspiring. *See* Exhibit 1. As described below, this actor was only one of Angelov's group's customers, but it is the only customer for which the FBI has obtained a window into the full extent of relevant extortion payments.

Because Angelov's business model was to profit through providing compromised computers for others to infect with ransomware, the resulting payments extorted by his coconspirators were within the scope of his conspiracy, in furtherance of that conspiracy, and foreseeable to him. *See id.* While it is not possible to determine whether any specific extortion by a conspiring ransomware actor resulted from the provision of a bot by Angelov's group, this is irrelevant for calculations under the guidelines: the extortion of ransomware payments by Angelov's coconspirators was "within the scope" of the criminal activity that Angelov agreed to jointly undertake by providing compromised computers for the purpose of infecting them with ransomware. *See id.* at 895.

The government anticipates that Angelov will attempt to minimize his culpability by focusing on the actors that installed the ransomware. But, as just described, this is contrary to the law governing losses involving conspiracies. Minimizing Angelov's role also denies the complexity of modern cybercrime. It takes a village, so to speak, to extort millions of dollars from ransomware targets.

Angelov was a manager—not merely a member—of an organization that was essential to the protracted, professionalized process of the ransomware business: a process that began with a spam email, continued with the cultivating of a botnet, followed-up with the installation of ransomware and an extortion demand, and ended with the world-wide diffusion of extortion money throughout criminal networks.

### 1.  Losses Connected to the Bitpaymer Group

One of Mario Kart's customers was the cybercriminal group that distributed the Bitpaymer ransomware variant. Angelov's group actively conspired with the Bitpaymer group between approximately August 2018 and December 2019.

Chat messages reviewed by the FBI revealed that, between approximately August 2018 and December 2019, the Mario Kart group provided the Bitpaymer ransomware group with access to compromised computers. The date of the earliest chat in which the FBI identified data sharing between the Mario Kart group and the Bitpaymer group was August of 2018. In November of 2019, chats reviewed by the FBI revealed that the two groups entered into an exclusive relationship in which the Mario Kart group would provide all of its available bots to the Bitpaymer group. This demonstrates that the prior supply of bots had been profitable for both groups. The FBI believes that this relationship ended, however, in December of 2019 when the Bitypaymer group was disrupted due to unsealed federal indictments.

The FBI has identified seventy-two U.S. computer networks that were

infected with the Bitpaymer ransomware between August 2018 and December 2019, resulting in $14,170,909.28 in extortion payments while Angelov was actively conspiring with the Bitpayer group. Exhibit 1.

Each of these ransomware payments are properly part of the loss calculation under USSG 2B1.1; the facts of Angelov's conspiracy map on to the six elements adopted by the Sixth Circuit to determine whether losses are within the scope of a criminal activity that a defendant agreed jointly to undertake: (1) the existence of a single scheme; (2) similarities in modus operandi; (3) coordination of activities among schemers; (4) pooling of resources or profits; (5) knowledge of the scope of the scheme; and (6) length and degree of the defendant's participation in the scheme. *See Donadeo*, 910 F.3d at 895. *See also United States v. Yousef*, No. 25-1426, 2026 WL 746912, at *3 (6th Cir. Mar. 17, 2026) (noting that not even all six of these factors need to weigh against a defendant in order for a court to find that a defendant engaged in jointly undertaken criminal activity).

Here, we have (1) a single scheme (ransomware extortion fueled by Angelov's provision of infected bots), with (2) identical modus operandi, (3) coordination (the provision of bots as ransomware targets), (4) pooling of resources (the infected bots) and joint profits (extortion profits shared with Angelov's group), (5) Angelov's knowledge that he was providing  bots to a ransomware actor, and (6) a common enterprise that lasted over a year.

8

### 2.  Losses Connected to the IcedID Group

Another group that distributed ransomware, known as IcedID, paid Angelov's group $1,000,000 for access to the Mario Kart botnet in late 2019 or early 2020. The FBI believes that this relationship began after the disruption of the Bitpaymer group necessitated that the Mario Kart group find a new primary customer. Eventually, the relationship with IcedID transitioned to a partnership between the two groups that lasted until approximately August of 2021.

No comparable analysis of the losses associated with this group's ransomware is available. However, given (1) the significant initial payment made to Mario Kart, and (2) the subsequent decision to evolve the relationship into a partnership, the losses inflicted by the Mario Kart – IcedID conspiracy are likely substantial.

## III.  Restitution

As part of his Rule 11 agreement, Angelov has agreed that the Court will order restitution to every identifiable victim of his offense. The government asks that the Court order $14,170,909.28 in restitution to the victims, documented in Exhibit 1, who paid extortion payments as result of Bitypaymer ransomware infections during the time that this group conspired with the Mario Kart group.

## IV.  Forfeiture

As part of his Rule 11 agreement, Angelov agreed to entry of a forfeiture money judgment in an amount representing the value of property that he obtained as

9

a result of his scheme. The government applied for entry of an order of forfeiture for a $1,645,000.00 forfeiture money judgment. The money judgment amount is a conservative approximation of the amount Angelov personally obtained in proceeds as a result of the conspiracy. The court entered an Order of Forfeiture in the amount of $1,645,000 on March 9, 2026. The government requests that the forfeiture money judgment be made part of Angelov's sentence.

## V.   Guidelines Range

The Probation Department calculates that Angelov's sentencing guidelines call for a term of imprisonment of 121 to 151 months, based on a Criminal History Category of I, a base offense level of seven, and the following adjustments (resulting in a total offense level of 32):

§ 2B1.1(b)(1)(K): Loss greater than $9,500,000 (+20)

§ 2B1.1(b)(2)(A)(i): More than ten victims (+2);

§ 2B1.1(b)(10)(C): Sophisticated Means (+2);

§ 3B1.1(a): Organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive (+4); and

§ 3E1.1(a) and (b): Acceptance of responsibility (-3).

The Government concurs with the Probation Department's calculations. Angelov, as part of his Rule 11 agreement, agreed to the enhancements of § 2B1.1(b)(2)(A)(i), § 2B1.1(b)(10)(C), and § 3B1.1(a). The Rule 11 Agreement, however, did not obligate Angelov to accept the government's loss calculations, and

the government is planning to introduce evidence of loss at sentencing.

## VI.   Sentencing Factors

18 U.S.C. § 3553(a) sets forth factors that the Court shall consider in sentencing the defendant. These factors are described below, numbered as corresponding to § 3553(a):

**(1)  The nature and circumstances of the offense…**

Angelov orchestrated a criminal enterprise that resulted in American business paying millions of dollars in extortion payments. His crimes, described above, are dramatic in scope, and the government believes their gravity is adequately captured by the Probation Department's guidelines calculations.

**…and the history and characteristics of the defendant;**

The government acknowledges that there are aspects of Angelov's history and characteristics that are positive. Most significantly, he voluntarily chose to travel to the United States to face charges and accept responsibility for his role in running the Mario Kart group. But this—and other factors in his favor that the government expects to be highlighted by defense counsel—are already incorporated into the government's sentencing recommendation, which is asking for a low-end sentence after a 50% guidelines reduction. The government believes that this adjustment accurately scores the side of the ledger in Angelov's favor, and that any further reduction in his sentence would be unwarranted.

It is also important for the Court to consider that, although the Sentencing Guidelines reflect no criminal history and assign Angelov a Criminal History Category of I, this is not the full measure of Angelov's past. Angelov has acknowledged a long history of criminal hacking activity conducted outside of the United States, dating back to at least 2005. In addition to victimizing U.S. citizens through the Mario Kart group, he has also engaged in computer-crime campaigns targeting other countries, including Germany and Japan. These activities are not "relevant conduct" in this case. But, in assessing Angelov's history and characteristics, the Court should recognize that his past is not typical of a zero-point offender—he has a prior decade-plus history of engaging in computer crimes.

Also, the Court should consider the context of Angelov's decision to travel to the United States to plead guilty. Angelov made this choice in October 2023 after several significant events that were potentially relevant to his calculations. The first of these was the Russian invasion of Ukraine in February of 2022.

The second was the arrest of a criminal associate, Vyacheslav Igorevich Penchukov, in Switzerland in November of 2022. Penchukov, who was subsequently extradited to the United States, was a member of the IcedID group and was responsible for negotiating that group's $1,000,000 payment to Angelov and his co-manager. Crucially, he was aware of Angelov's identity. Angelov's initial outreach to U.S. authorities occurred only a few days after Penchukov's arrest; Angelov has

admitted to the FBI that Penchukov's arrest was a significant motivating factor in his decision to contact the U.S. government and seek to negotiate a resolution.

Finally, a Russian business venture of Angelov's collapsed in February of 2023, resulting in a significant loss of investor funds.

Angelov's decision to voluntarily travel to the U.S. to face charges should be considered in his sentencing, and the government has incorporated it into its recommendation. Yet, Angelov's decision was a calculated one, and that it was not completely altruistic. It is also important to recognize that, at the time of Angelov's ultimate travel and surrender, he was living in the United Kingdom, a country from which the U.S. could have sought his extradition.

**(2) The need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence; (C) to protect the public from further crimes of the defendant; and (D) to provide defendant with appropriate education or vocational training.**

Angelov's punishment should consider not only the scope and seriousness of his criminal conduct but also the need to deter future crimes, both by Angelov and by others.

Many cybercriminals commit their crimes from overseas locations believing that they operate with impunity, forever beyond the reach of the U.S. justice system. This has contributed to cybercrime becoming a multi-billion-dollar business. It is crucial, therefore, that significant sentences are imposed when foreign

cybercriminals are brought to justice in the United States, sending a message to criminals who remain overseas that there is risk to their continued victimization of U.S. citizens and corporations.

Specific deterrence is also relevant in this case. Angelov is an individual who has never been sanctioned—in any way, in any jurisdiction—despite a prolific criminal career spanning well over a decade. A significant custodial sentence is necessary to convey to Angelov that returning to crime should not be an option after his release.

### (3) The kinds of sentences available

The maximum penalty for Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1343, is 20 years' imprisonment followed by up to three years of supervised release, and/or a fine not to exceed $250,000.

### (4) The sentencing range established by the Guidelines

As set forth above in Section IV, the Probation Department has calculated a guidelines range calling for 121 to 151 months' imprisonment, with which the government concurs.

### (5) Pertinent policy statements issued by the Sentencing Commission

The government is unaware of any pertinent policy statement issued by the United States Sentencing Commission.

**(6)  The need to avoid unwarranted sentencing disparities among defendants with similar records found guilty of similar conduct**

According to the Judiciary Sentencing Information (JSIN) platform, during the last five fiscal years (FY2020-2024), there were 59 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 32 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 58 defendants (98%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 89 months and the median length of imprisonment imposed was 84 months.

Given the 50% reduction in guidelines that the government is seeking—along with the factors described above concerning the seriousness of the offense, the need for deterrence, and the fact that Angelov's criminal history of I is not fully representative of his criminal past—the government believes that its recommendation of 61 months would be appropriate and avoid unwarranted sentencing disparity among similarly situated defendants.

The government also directs the Court to the sentencings of two defendants relevant to the goal of avoiding unwarranted sentencing disparity.

The first of these is Vitlalii Alexandrovich Balint, sentenced by this Court to 20 months in prison in October of 2025. *See* Judgement in *United States v. Vitalii Alexandrovich Balint*, 24-cr-20416, ECF No. 34, PageID.203 (E.D. Mich., October 15, 2025). Balint was a member of the Mario Kart group, and he provided essential

coding connected to the group's distribution of spam email. His guidelines were 33 to 41 months, but the government requested a reduced guidelines range of 26 to 33 months and a sentence of 26 months. *Balint*, *Government's Sentencing Memorandum*, ECF No. 32, PageID.195 (E.D. Mich., October 15, 2025). While Balint's role in the Mario Kart was significant, he was Angelov's subordinate. Given the differential of the two individuals' guidelines' ranges and relative culpability, a sentence less than the 61 months that the government requests would produce an unwarranted disparity between the two—even considering that Balint was extradited to the United States as opposed to voluntarily travelling, as Angelov did.

The second individual whose sentence is relevant to considering consistency in sentencing is Vyacheslav Igorevich Penchukov, the criminal associate of Angelov's whose arrest prompted Angelov to contact U.S. Authorities and seek resolution of his case. After extradition to the United States, Penchukov was sentenced to 108 months in prison. *See* Judgement in *United States v. Vyacheslav Igorevich Penchukov*, 24-cr-3021, ECF No. 37, PageID.359 (D. Neb., July 12, 2024). Based on correspondence with Angelov's defense team, the government expects that Angelov will argue that sentencing Angelov to imprisonment will discourage others from approaching U.S. authorities to resolve their case, as he did. The government—based on the comparison between the sentence that Penchukov received and the sentence that it is seeking for Angelov—disagrees. While their

16

criminal activity was not identical and Penchukov faced initially higher guidelines, both Angelov and Penchukov are long-time computer criminals who eventually pleaded guilty in the United States. A similarly situated individual overseas would instantly recognize that the 108-month sentence imposed on the extradited Penchukov is substantially more than the 61-month sentence that the government is seeking to be imposed in this case.

### (7) The need to provide restitution

Restitution is mandatory in this case, as dictated by the Mandatory Criminal Restitution Act codified at 18 U.S.C. § 3663A. The necessary restitution in this case is described above in Section II.

## VII.  Recommendation

For all the reasons above, and consistent with the Rule 11 agreement between the parties, the government recommends that the Court sentence defendant Ilya Angelov to 61 months in prison.

Respectfully submitted,

JEROME F. GORGON JR.
United States Attorney


*/s/ Timothy J. Wyse*
Timothy J. Wyse
Assistant U.S. Attorney
211 West Fort, Suite 2001
March 18, 2026                           Detroit, Michigan 48226

17

## **Certificate of Service**

I certify that on March 18, 2026, I electronically filed this motion response for the United States with the Clerk of the United States District Court for the Eastern District of Michigan using the ECF system, which will send to counsel of record.

<table>
<tr><td></td><td>s/Timothy J. Wyse<br>Timothy J. Wyse<br>Assistant U.S. Attorney<br>211 West Fort, Suite 2001</td></tr>
<tr><td>March 18, 2026</td><td>Detroit, Michigan 48226</td></tr>
</table>

18